## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAYNOLD L. GILBERT, Individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>THRESHOLD PHARMACEUTICALS, INC., HAROLD "BARRY" E. SELICK, and JANET I. SWEARSON, )<br><br>Defendants. ) | **CIVIL ACTION NO. 07-cv-06490**<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Raynold L. Gilbert ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Threshold Pharmaceuticals, Inc. ("Threshold" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal class action on behalf of purchasers of the common stock of Threshold, who purchased Threshold's common stock pursuant or traceable to the Company's February 4, 2005 Initial Public Offering (the "IPO") through July 14, 2006, inclusive (the "Class Period"), including those who purchased Threshold's common stock pursuant to the Company's October 12, 2005 Follow-On Offering (the "Follow-On Offering"), seeking to pursue remedies

under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Threshold is a biotechnology company that focuses on the discovery and development of drugs based on "Metabolic Targeting," an approach that targets fundamental differences in metabolism between normal and certain diseased cells.  According to the defendants, Metabolic Targeting could be used in the treatment of cancer and benign prostatic hyperplasia ("BPH").  During the Class Period, the Company's "lead product candidate" was TH-070, a product that was supposed to selectively target and treat dividing tumor cells.

3.      In preparation for the Company's IPO in February 2005, the Company conducted a "Phase II" study of TH-070 on 30 men in Europe (the "European Phase II" study).  Based on the ostensible success reportedly achieved in the European Phase II study, the Company successfully completed its $37 million IPO on February 4, 2005.  Subsequently, the Company completed a $65 million Follow-On Offering on October 12, 2005.

4.      On May 11, 2006, the Company shocked investors when it revealed that, as a result of "abnormalities observed in liver enzyme levels" in multiple test subjects in ongoing clinical trials of the product, the U.S. Food and Drug Administration ("FDA") had placed the Company's U.S. TH-070 program on partial clinical hold.  The FDA also requested that the Company provide additional information regarding the drug's acceptable dose and duration of treatment in BPH patients.  These abnormalities included three "serious adverse events" observed in the Company's Phase-3 European/Canadian clinical trial, and three additional observations of elevated liver enzymes that occurred in other ongoing clinical trials.  On this news, shares of the Company's stock fell $10.56 per share, or over 75.4 percent, to close on May 12, 2006 at $3.44 per share, on unusually heavy trading volume.

5.      Then on July 17, 2006, the Company admitted that clinical trials failed to demonstrate statistically different results between TH-070 and the placebo in the alleviation of prostate enlargement.  Based on the safety and efficacy results of the trials, the Company discontinued its development of TH-070 for BPH.  On this news, shares of the Company's stock fell an additional $1.63 per share, or over 51 percent, to close on July 17, 2006 at $1.55 per share, on unusually heavy trading volume.

6.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's prospects.  Specifically, defendants failed to disclose or indicate the following: (1) that results of the European Phase II study failed to properly reflect TH-070's impact on the different types of BPH; (2) that based on clinical study results, TH-070's actual treatment population would be significantly lower than previously indicated; (3) that defendants knew or recklessly disregarded the fact that TH-070 as a treatment for moderate BPH would not yield positive results because of efficacy and safety problems associated with the drug; and (4) that the defendants knew of previous studies which illustrated that TH-070 would promote high liver toxicity.

7.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's IPO and Follow-On Offering were actively marketed, and are actively traded, in this Judicial District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.    Plaintiff, Raynold L. Gilbert, as set forth in the accompanying certification, incorporated by reference herein, purchased Threshold common stock at artificially inflated prices during the Class Period and has been damaged thereby.

13.    Defendant Threshold is a Delaware corporation with its principal place of business located at 1300 Seaport Boulevard, Redwood City, California.

14.    Defendant Harold "Barry" E. Selick ("Selick") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a member of the Board of Directors.

15.    Defendant Janet I. Swearson ("Swearson") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

16.    Defendants Selick and Swearson are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Threshold's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    Threshold is a biotechnology company that focuses on the discovery and development of drugs based on "Metabolic Targeting," an approach that targets fundamental differences in metabolism between normal and certain diseased cells.  During the Class Period, the Company's "lead product candidate" was TH-070, a product that was supposed to selectively target tumor cells, and treat and slow dividing tumor cells.  Prior to, and during the Class Period, the Company conducted clinical trials, including the European Phase II study, to test and evaluate TH-070, and reported positive results to investors.

18.    On February 4, 2005, the Company issued a press release entitled "Threshold

Pharmaceuticals Announces Initial Public Offering."  Therein, the Company, in relevant part, stated:

> Threshold Pharmaceuticals, Inc. announced today its initial public offering of 5,333,333 shares of common stock at a price of $7 per share. All of the shares are being offered by Threshold. The shares will trade on the NASDAQ National Market under the symbol "THLD".
>
> * * *
>
> The registration statement relating to the initial public offering of common shares has been declared effective by the Securities and Exchange Commission.

### Materially False and Misleading
### Statements Issued During the Class Period

19.     In connection with the Company's IPO on February 4, 2005, the Company filed a Registration Statement with the SEC.  Therein, the Company, in relevant part, stated:

> **Our initial clinical focus is the treatment of cancer and benign prostatic hyperplasia, or BPH, a disease characterized by overgrowth of the prostate.  We have three product candidates.**
>
> * * *
>
> **TH-070, our lead product candidate for the treatment of symptomatic BPH is being evaluated in a Phase 2 clinical trial. We have completed enrollment in this trial, and we are evaluating interim data.**
>
> * * *
>
> **Metabolic Targeting**
>
> **Metabolic Targeting is a therapeutic approach** that targets fundamental differences in energy metabolism between normal and certain diseased cells. To survive, these diseased cells rely predominantly on glycolysis, also called glucose metabolism, which is the process by which glucose is converted to energy. As a consequence, these cells consume more glucose than do normal cells. In cancer, this increased consumption of glucose has two causes: the process of a normal cell becoming a rapidly dividing cancer cell; and the exposure of a cell to the low oxygen

conditions, also called hypoxia, within those regions of most solid tumors where cells are dividing slowly. When these cells shift energy production to glycolysis, they must increase the levels of the proteins needed to transport and metabolize glucose. Similarly, cells in BPH rely predominantly on glycolysis for energy production. **Metabolic Targeting takes advantage of these metabolic differences to selectively target these diseased cells.**

For the treatment of cancer, we believe that **our product candidates based on Metabolic Targeting can be broadly applied to the treatment of most solid tumors and have the potential to significantly increase the effectiveness of existing therapies. Metabolic Targeting provides the opportunity to treat not only rapidly dividing tumor cells,** which are targeted by chemotherapy and radiation, **but also slowly dividing tumor cells that generally evade these traditional therapies and ultimately contribute to relapse.** For the treatment of BPH, we believe that Metabolic Targeting will enable us to develop a new class of drugs to treat the disease more rapidly and effectively, with fewer side effects than current therapies. **We believe that our focus on Metabolic Targeting, combined with our expertise in medicinal chemistry and drug development, provides us with the capability to identify, discover and develop novel therapies.**

\* \* \*

### TH-070

**TH-070, our lead product candidate for the treatment of symptomatic BPH, is being evaluated in a Phase 2 trial in Italy. The primary objective of this trial is to determine the safety and tolerability of TH-070 in patients with BPH. In addition, patients are being evaluated for efficacy** as measured by changes in specific variables that have been used in clinical trials of currently marketed BPH drugs **to support their FDA approval**. The primary endpoint specified in the protocol for our trial is a comparison of prostate size between baseline and day 28 of treatment. **We have completed enrollment and are evaluating interim data. We observed statistically significant improvements in all variables measured by day 28. In the study, TH-070 was well tolerated with no therapy-related side effects.** … Based on these interim Phase 2 results, we are designing a registrational program for TH-070 to treat symptomatic BPH.

\* \* \*

7

TH-070 is an orally administered small molecule **that has been reported to inhibit the enzyme that catalyzes the first step in glycolysis**.

* * *

**TH-070 offers the potential to treat symptomatic BPH via a novel mechanism**, by reducing the prostate size through Metabolic Targeting. **By directly inhibiting glycolysis in prostate cells, we expect TH-070 to reduce the size of the prostate more rapidly than current medical treatments, without the attendant side effects**, which include decreased libido, impotence and cardiovascular effects. [Emphasis added.]

20. On May 19, 2005, the Company issued a press release entitled "Threshold Pharmaceuticals Announces Positive Results From TH-070 Phase 2 Study in Treatment of Benign Prostatic Hyperplasia." Therein, the Company, in relevant part, stated:

**Trial Shows Significant Sustained Improvement in Symptoms Six Months Off Therapy**

Threshold Pharmaceuticals Inc. today announced follow up results of a Phase 2 study of its investigational drug candidate, TH-070 (lonidamine) for the treatment of benign prostatic hyperplasia (BPH). **Six months after cessation of treatment, BPH symptoms (IPSS) in patients remained significantly improved compared to baseline as were maximum urine flow, post void urine volume, and PSA.** The trial, conducted in 2004 at the University of Bari, Italy, met its primary endpoint, a mean reduction in prostate volume at day 28 compared to baseline (-11.2%, p<0.001), and all other Day 28 endpoints. **Based on promising data from the initial dose group of patients in this study, Threshold elected not to enroll a second higher dose group and instead plans to initiate a Phase 2 multi-center study in the US and a Phase 3 multi-center study in Europe for TH-070 to treat symptomatic BPH in mid 2005.**

In the reported trial, **thirty patients with symptomatic BPH** received TH-070 orally (150 mg) once daily for 28 days. **The regimen was well tolerated, with no therapy-related adverse side effects**. Highlights of the post study follow-up results six months later include:

- Validated International Prostate Symptom Scores (IPSS) improved from a mean of 19.5 prior to treatment to 12.2 at Day

28 (p<0.001) with an additional improvement to 9.8 after six month follow-up.

- Mean Maximum Urine Flow improved 34.3% from a mean of 9.4 mL/sec at baseline to 12.6 mL/sec at day 28 (p=0.002) and improved 45.6% to a mean of 13.7 mL/sec at six month follow-up (p<0.001).

- PSA decreased on average by 17.8 percent from a mean of 3.6 at baseline to 2.8 ng/mL at Day 28 (p<0.001) and on average by 14.8% to a mean of 3.1 ng/mL at six month follow-up (p=0.012).

- Mean PVR (Post-void residual urine volume) decreased by 52.5 percent from a mean of 82.1 cc at baseline to 31.6 cc at Day 28 (p<0.001) and to 39.0 cc at six month follow-up (p=.003).

**"The magnitude and rapidity of the patients' response to TH-070 are very encouraging in the pharmaceutical treatment of BPH**," said George Tidmarsh, founder of Threshold Pharmaceuticals. "We are especially pleased to see that the effect of TH-070 is sustained off therapy." [Emphasis added.]

21. On June 27, 2005, the Company issued a press release entitled "Threshold Pharmaceuticals Initiates Registrational Program of TH-070 for Treatment of Benign Prostatic Hyperplasia." Therein, the Company, in relevant part, stated:

**U.S. Phase 2 Clinical Trials Underway**

Threshold Pharmaceuticals, Inc. announced today the initiation of its registrational program of its investigational drug candidate, TH-070 (lonidamine), **under a U.S. Food and Drug Administration IND. The company has begun a U.S. Phase 2 clinical trial evaluating the dosing, safety and activity of TH-070 for the treatment of symptomatic benign prostatic hyperplasia (BPH)**. A Phase 3 multi-center European trial evaluating the safety and efficacy of TH-070 is expected to commence in mid 2005. BPH is a non-cancerous enlargement of the prostate that affects over 54 million men worldwide and at least 17 million men over the age of 40 in the United States.

The Phase 2 trial is a randomized, placebo controlled, double-blinded study that will be conducted at up to thirty centers across the United States. Approximately 200 patients will participate in

the study for up to four and a half months. Patients will be randomized to receive placebo or one of four doses of TH-070 daily for 28 days, and will be followed off of therapy for an additional three months. The primary objective of this study is to investigate the dose-response relationship of TH-070 with respect to efficacy and safety.

Additionally, **this study is designed to confirm the findings for 28 days of dosing previously announced by Threshold from a Phase 2 single center study conducted in 2004 at the University of Bari, Italy. That trial met its primary endpoint, a mean reduction in prostate volume** measured by Trans-rectal Ultrasound (TRUS) at day 28 compared to baseline (-11.2%, p<0.001), **and all other day 28 endpoints. Six months after cessation of treatment, BPH symptoms (International Prostate Symptom Scores) in patients remained significantly improved compared to baseline as were maximum urine flow, post-void urine volume, and PSA (Prostate Specific Antigen).**

* * *

**"Our U.S. trial demonstrates Threshold's ability to launch a major clinical program in the BPH setting," said Alan Colowick, chief medical officer of Threshold. "We are excited about the potential that this therapy may offer men suffering from the symptoms of BPH while addressing the underlying disease itself**. This trial complements a Phase 3 trial that will soon be initiated in Europe."

Both studies will investigate the effects of TH-070 on clinically important efficacy endpoints, including impact on symptoms as measured by IPSS, prostate volume measured by TRUS, change in PSA, change in maximal flow rate of urine, and a change in post-void residual of urine.

**"The data thus far suggests that there is great promise for this treatment," said Dr. Claus Roehrborn, Chair of Urology at University of Texas, Southwestern and one of the lead investigators in the U.S. Phase 2 trial. "TH-070 has the potential to actually reverse the BPH process and bring relief to many men who suffer from this condition."** [Emphasis added.]

22.    On July 28, 2005, the Company issued a press release entitled "Data for Threshold

Pharmaceuticals' TH-070 to be Presented at American Urological Association Western Section

Conference." Therein, the Company, in relevant part, stated:

**Dr. Michael Brawer, M.D. to Appear August 2, 2005 in Vancouver**

Threshold Pharmaceuticals Inc. (Nasdaq: THLD) today announced that Dr. Michael Brawer, MD, Director of the Northwest Prostate Institute will be presenting at the upcoming 81st Annual American Urological Association Western Section Conference to be held July 30 - August 4, 2005 at the Westin Bayshore Resort & Marina in Vancouver, BC, Canada.

* * *

Dr. Brawer will present a paper entitled, "**28 Day Lonidamine Therapy Significantly Reduces Prostate Volume and Improves Urine Flow in Symptomatic Benign Prostatic Hyperplasia: Results of a Phase 2 Open-Label Study**" which will examine the effects of TH-070 on International Prostate Symptom Score (IPSS), maximum flow rate, residual urine and prostate volume in patients with BPH. **The findings conclude that the use of the drug induces a rapid and significant improvement by Day 14 with further improvements at Day 28 that were sustained through Day 200.** Patients continued to be followed through Month 6 and data on the durability of these effects will be presented.

* * *

Dr. Brawer will present additional analyses which support the conclusion that TH-070 is active in BPH. **These analyses show that TH-070 improves symptoms in patients regardless of their baseline disease status in terms of severity of symptoms and prostate volume**. Additionally, improvements in urine flow rate correlated well with improvements in symptoms. [Emphasis added.]

23.    On August 8, 2005, the Company issued a press release entitled "Threshold Pharmaceuticals Announces Initiation of Phase 3 Trial in Europe for the Treatment of Benign Prostatic Hyperplasia." Therein, the Company, in relevant part, stated:

Threshold Pharmaceuticals Inc. today announced the initiation of a Phase 3 clinical trial as part of a registrational program of its investigational drug candidate TH-070 (lonidamine). The study will measure the dosing, safety, and efficacy of TH-070 in subjects

with symptomatic benign prostatic hyperplasia (BPH). The company has begun patient enrollment and will conduct the trials at nearly 60 investigational sites in selected European countries.

The Phase 3 trial will be a randomized, placebo-controlled, double-blinded study, enrolling men 50-80 years of age with symptomatic BPH. Approximately 480 patients will participate in the study for up to four and a half months. The primary objective is to evaluate the efficacy of TH-070 (50 mg, 150 mg) compared to placebo as measured by IPSS (International Prostate Symptom Scores) in subjects with symptomatic BPH.

**"We are excited about the potential of this therapy based on promising Phase 2 clinical data**," said Alan Colowick, chief medical officer of Threshold.

"This is another important clinical milestone in our registrational program. The Phase 3 European trial complements our Phase 2 trial recently begun in the United States."

**The study is also designed to confirm the findings for 28 days of dosing previously announced by Threshold from a Phase 2 single center study conducted in 2004 at the University of Bari, Italy. That trial met its primary endpoint, a mean reduction in prostate volume** measured by trans-rectal ultrasound (TRUS) at day 28 compared to baseline (-11.2%, p<0.001), **and all other day 28 endpoints. Six months after cessation of treatment, BPH symptoms (International Prostate Symptom Scores) in patients remained significantly improved compared to baseline as were maximum urine flow, post-void urine volume, and PSA (Prostate Specific Antigen).** [Emphasis added.]

24.    On October 12, 2005, the Company issued a press release entitled "Threshold Announces Follow-On Offering of 6,250,000 Shares of Common Stock." Therein, the Company, in relevant part, stated:

Threshold Pharmaceuticals, Inc. today announced a follow-on offering of 6,250,000 shares of its common stock at a price to the public of $10.46 per share. Threshold and certain stockholders of Threshold have granted to the underwriters an option to purchase up to an additional 937,500 shares of common stock to cover overallotments, if any, within 30 days from the date of the prospectus. 468,750 of these shares may be sold by the selling stockholders, proceeds from which will not be received by the Company.

Morgan Stanley is acting as sole bookrunning manager and CIBC World Markets and Lazard Capital Markets are acting as co-managers of the offering.

25.    In connection with the Follow-On Offering, the Company filed a Registration Statement with the SEC.  Therein, the Company, in relevant part, stated:

We are a biotechnology company focused on the discovery, development and commercialization of drugs **based on Metabolic Targeting, an approach that targets fundamental differences in metabolism between normal and certain diseased cells**. We are building a pipeline of drugs that are designed to selectively target tumor cells and abnormally proliferating cells so that the drugs are efficacious and less toxic to healthy tissues than conventional drugs, thereby providing improvements over current therapies.

**Our initial clinical focus is the treatment of benign prostatic hyperplasia, or BPH**, a disease characterized by overgrowth of the prostate, and the treatment of cancer. We have three product candidates for these programs, for which we have exclusive worldwide marketing rights:

- **TH-070, our lead product candidate for the treatment of symptomatic BPH, has completed a Phase 2 clinical trial in Italy.** We initiated a Phase 2 trial in the United States in June 2005 and a Phase 3 trial in Europe in August 2005, both of which are multi-centered, randomized, blinded and placebo controlled trials.

* * *

**Metabolic Targeting**

**Metabolic Targeting is a therapeutic approach that targets fundamental differences in energy metabolism between normal and certain diseased cells.** To survive, these diseased cells rely predominantly on glycolysis, also called glucose metabolism, which is the process by which glucose is converted to energy. As a consequence, these cells consume more glucose than do normal cells. Metabolic Targeting takes advantage of these metabolic differences to selectively target these diseased cells.

Since BPH cells rely predominantly on glycolysis for energy production, we believe that **Metabolic Targeting will enable us to develop a new class of drugs to treat the disease more rapidly and effectively, with fewer side effects than current therapies.**

**For the treatment of cancer, we believe that our product candidates based on Metabolic Targeting can be broadly applied to the treatment of most solid tumors and have the potential to significantly increase the effectiveness of existing therapies.** Metabolic Targeting provides the opportunity to treat not only rapidly dividing tumor cells, which are targeted by chemotherapy and radiation, but also slowly dividing tumor cells that generally evade these traditional therapies and ultimately contribute to relapse. We believe that **our focus on Metabolic Targeting, combined with our expertise in medicinal chemistry and drug development, provides us with the capability to identify, discover and develop novel therapies**.

**TH-070**

TH-070, our lead product candidate for the treatment of symptomatic BPH, is an orally administered small molecule that **has been reported to inhibit glycolysis by inactivating hexokinase, the enzyme that catalyzes the first step in glycolysis. By targeting the metabolism of glucose and other processes that are essential for prostate cell viability, TH-070 kills prostate cells, reducing the size of the prostate, and** therefore may provide an effective treatment for symptomatic BPH. **We have completed a Phase 2 trial in Italy of TH-070 in 30 men with symptomatic BPH. In this study, TH-070 appeared to be generally well tolerated when administered at a dose of 150 mg orally every day for 28 days. The drug appears to be active in treating BPH.** Using baseline values as a control, **statistically significant changes in all efficacy endpoints were observed. Based on these data demonstrating tolerability and important clinical activity**, an investigational new drug application, or IND, was submitted to the FDA in the second quarter of 2005.  [Emphasis added.]

26. On March 1, 2006, the Company issued a press release entitled "Threshold Pharmaceuticals Reports Fourth Quarter and Year End 2005 Financial Results and Provides 2006 Guidance."  Therein, the Company, in relevant part, stated:

"We achieved all of our key corporate and clinical milestones for 2005 and are looking forward to achieving significant milestones in 2006," said Barry Selick, Threshold's chief executive officer. "Over the past year, we initiated two placebo-controlled, multi-center trials of TH-070 for BPH: a Phase 2 trial in the United States and a Phase 3 study in Europe. We also reported encouraging Phase 1 results for glufosfamide plus gemcitabine in

14

the first-line treatment of advanced solid tumors that enabled us to move that combination regimen into Phase 2 trials in advanced pancreatic cancer patients. **In addition, we raised approximately $100 million in net proceeds through an initial public offering and a follow-on public offering, both of which were completed last year**."

<u>**Recent Highlights**</u>

* * *

- Initiated and continued to enroll patients in Phase 2 and Phase 3 trials of TH-070 for BPH;

- Published positive Phase 2 results for TH-070 in patients with BPH in Reviews in Urology;

- Raised net proceeds of $38 million through an IPO and an additional $62 million through a follow-on public offering; and

- Received important patents related to TH-070 and 2DG from the U.S. Patent and Trademark Office.

<u>**2006 Guidance and Key Milestones**</u>

The Company expects 2006 cash requirements to be in the range of $48 to $55 million. The Company continues to expect cash to last through the end of 2007.

The Company anticipates the following clinical milestones in 2006:

- Report results from a Phase 2 study in BPH with TH-070 by end of 2006;

- Report results from a Phase 3 study in BPH with TH-070 by end of 2006;

* * *

- Commence three supportive studies with TH-070;  [Emphasis added.]

27.   On May 10, 2006, the Company issued a press release entitled "Threshold Pharmaceuticals Reports First Quarter 2006 Financial Results."   Therein, the Company, in relevant part, stated:

15

"We continued to achieve our clinical milestones with the completion of enrollment in both the Phase 2 and Phase 3 trials of TH-070 in BPH, and we expect to report the results of these trials around the beginning of the fourth quarter," said Barry Selick, Threshold's chief executive officer. "We are also on track to report results from the Phase 3 glufosfamide trial in second-line pancreatic cancer patients by the end of this year as well."

**Recent Highlights**

- Completed enrollment of Phase 3 trial of TH-070 in BPH patients;

- Completed enrollment of Phase 2 trial of TH-070 in BPH patients;

* * *

- Received important patents related to TH-070 and 2DG from the U.S. Patent and Trademark Office.

The Company anticipates the following clinical milestones in 2006:

- Report results from ongoing Phase 2 and Phase 3 trials of TH-070 in BPH around the beginning of the fourth quarter of 2006;

* * *

- Commence three supportive trials with TH-070;

28.    The statements contained in ¶¶ 19 – 23 and 25 – 27 were materially false and misleading when made because Defendants failed to disclose or indicate the following: (1) that results of the European Phase II study failed to properly reflect TH-070's impact on the different types of BPH; (2) that based on clinical study results, TH-070's actual treatment population would be significantly lower than previously indicated; (3) that defendants knew or recklessly disregarded the fact that TH-070 as a treatment for moderate BPH would not yield positive results because of efficacy and safety problems associated with the drug; and (4) that the defendants knew of previous studies which illustrated that TH-070 would promote high liver

16

toxicity.

## The Truth Begins to Emerge

29.    On May 11, 2006, the Company shocked investors when it issued a press release

entitled "Threshold Pharmaceuticals Announces Changes to TH-070 Clinical Development

Program."  Therein, the Company, in relevant part, stated:

> **FDA Placed Program on Partial Clinical Hold; U.S. Phase 2 Study Dosing Completed[;] European/Canadian Phase 3 Clinical Trial Will Be Amended[;] Conference Call to Be Held Today at 5:00 p.m. EDT**
>
> Threshold Pharmaceuticals, Inc., today announced changes in the status of its TH-070 clinical development program for BPH (Benign Prostatic Hyperplasia).
>
> **As a result of abnormalities observed in liver enzyme levels in 6 subjects in ongoing clinical trials, the FDA (U.S. Food and Drug Administration) has placed the U.S. TH-070 program on partial clinical hold and has requested that the Company provide additional information related to the drug's acceptable dose and duration of treatment in BPH patients**. These abnormalities include 3 serious adverse events observed at 3 months of dosing in the phase 3 European/Canadian clinical trial and 3 additional observations of elevated liver enzymes that occurred in other ongoing clinical trials.
>
> **The Company is amending the phase 3 European/Canadian trial to discontinue dosing**. 567 patients have been enrolled in this study, virtually all whom have completed 28 days of dosing. Data from these patients combined with that from the 216 U.S. phase 2 patients will be evaluated and will inform the Company's next steps for this program and its response to the FDA.
>
> * * *
>
> Lonidamine (TH-070) was originally approved for the treatment of cancer in 3 European countries in the mid-1980's. Published randomized clinical trials of Londiamine [sic] in approximately 3500 cancer patients did not reveal statistically significant elevations in liver function tests. **In the Company's previous single center phase 2 TH-070 trial, one patient had transient elevated liver enzymes**.  [Emphasis added.]

17

30.    Also on May 11, 2006, the Company held a conference call with investors and financial analysts.  During this call, Defendant Selick and other Company executives, in relevant part, stated:

> ALAN COLOWICK: **…** I will describe the three SAEs in order and our two interactions with the FDA and then, importantly, our plan moving forward.
>
> The first FAE [sic] was reported in a patient in Europe who had the concomitant history of acute alcoholic intoxication and presented clinically jaundice with a markedly elevated liver enzymes as well as elevated bilirubin level.  The patient had a prolonged hospitalization that was otherwise unremarkable, and we're happy to report that that case has essentially resolved.
>
> **We had a discussion with the FDA about this specific case on April 10, as well as the other data that we had available to us at that time across all of our studies.**
>
>                               * * *
>
> [Analyst]: A couple of questions -- first off, can you review the liver tox data from TH-070 in the oncology setting?
>
> BARRY SELICK: Can I review that?
>
> [Analyst]: Yes --
>
> BARRY SELICK: Sure. As you know, the data for us come primarily from that which is published in the literature. **I will remind you that the drug was approved in multiple European countries since the mid-1980s for the cancer indication. In the literature are approximately 80 published studies, around 20 of which are controlled clinical trials.** In those controlled clinical trials, greater than 3500 patients are reported, and in those studies, there is not any evidence of statistically significant differences in liver toxicity between those patients who received Londiamine versus those who did not.
>
> [Analyst]: But there are trends, correct?
>
> ALAN COLOWICK: **There are studies in which numerically, in some studies, the liver toxicity was higher numerically** …
>
>                               * * *

[Analyst]: When will we have efficacy data?

ALAN COLOWICK: Well, we expect now to -- as we've mentioned, all patients in the U.S. study have completed their days 28 dosing and in Europe now at this time, actually tomorrow, all patients there will have completed their 28-day dosing. **So if what you mean by efficacy data are the data from these ongoing studies, we will get those in-house as quickly as we can and get them analyzed. We clearly expect that will occur during the third quarter.**

* * *

[Analyst]: … I was just wondering if you could in any way provide clarity on the timeline for your response to the FDA.

ALAN COLOWICK: Yes, John, I think what I can tell you is obviously we're going to put in as rapid and quality a response to this notification as we can. First of all, we have to receive the formal notification. We were informed yesterday afternoon by a telephone call. The FDA has up to 30 days to send that letter, although I think our reviewers in this division are trying to cooperate and get that to us sooner. We expect it could come sooner. Until we have that letter, there's a formal response that is required; it's called a complete response to the partial clinical hold. Until we have that letter, we can't say with certainty what it will take to address their concerns. **I think we have a very good feeling of what it will take, based on our conversation yesterday, but until we see it in writing, we can't say with certainty.**

**I can tell you that we are going to do everything we can to get the clinical data -- that is the data in these roughly 800 patients from the European and U.S. Phase II studies and in particular the day-28 data from these patients. We will do everything we can to get that in-house just as rapidly as we possibly can. Then it will be a matter of analyzing those data. We've got some important, completed studies, preclinical talk studies that the FDA is just becoming aware of because they've just recently been completed and will have to tie those two things together, so that may take some time, although obviously it will be a number one priority in the Company.** [Emphasis added.]

31.    On this news, shares of the Company's stock fell $10.56 per share, or over 75.4

percent, to close on May 12, 2006 at $3.44 per share, on unusually heavy trading volume.

32.     Then on July 17, 2006, the Company issued a press release entitled "Phase 2 and

Phase 3 Clinical Trials of TH-070 in Benign Prostatic Hyperplasia (BPH) Do Not Meet Primary

Endpoint."  Therein, the Company, in relevant part, stated:

> Threshold Pharmaceuticals, Inc., today announced that its Phase 2 and Phase 3 trials of TH-070 did not meet their primary endpoints of symptomatic improvement as measured by IPSS (International Prostate Symptom Score). **The Phase 2 trial did not generate a statistically significant dose response relationship and the Phase 3 trial did not achieve a statistically significant difference in IPSS between TH-070 and placebo. Based on the safety and efficacy results of these trials, Threshold plans to discontinue development of TH-070 for BPH.**
>
> * * *
>
> **The interim analysis of the Phase 2 data did not demonstrate a clear dose response in IPSS at one month of treatment.** The mean IPSS change from baseline as measured following placebo run-in to one month of treatment ranged from -2.1 to -2.5 across the five dose groups, including the placebo control. **The interim analysis of the Phase 3 data did not demonstrate a statistically significant difference in IPSS between either of the two drug dose groups (50mg and 150mg) and placebo. The mean IPSS change from baseline as measured following the placebo run-in to one month of treatment ranged from -1.9 to -2.9 and to three months of treatment ranged from -4.4 to -5.5. There was no statistically significant difference in any of the secondary endpoints** with the exception of change in prostate specific antigen (PSA) which did show statistical significance at certain time points. Primary endpoint results are summarized below.
>
> **The interim safety results from the Phase 2 and Phase 3 trials include seven cases of myalgia and four cases of testicular pain. Across all TH-070 clinical trials, there were 15 patients who had elevations in liver enzymes** (as defined by elevations greater than three times the upper limit of normal), two of whom were in the placebo group. **Six of the patients with elevated liver enzymes were deemed to have experienced serious adverse events**.  [Emphasis added.]

33.     On this news, shares of the Company's stock fell an additional $1.63 per share, or

over 51 percent, to close on July 17, 2006 at $1.55 per share, on unusually heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

34.    This is a federal class action on behalf of purchasers of the common stock of Threshold, who purchased Threshold's common stock pursuant or traceable to the Company's February 4, 2005 Initial Public Offering (the "IPO") through July 14, 2006, inclusive (the "Class Period"), including those who purchased the Company's common stock pursuant to the Company's October 2005 Follow-On Offering (the "Follow-On Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").    Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

35.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Threshold's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Threshold or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37.    Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Threshold; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

39.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

40.     The market for Threshold's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Threshold's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased Threshold's common stock relying upon the integrity of the market price of Threshold's common stock and market information

relating to Threshold, and have been damaged thereby.

41.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Threshold's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

42.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Threshold's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Threshold and its financial well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

43.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44.    During the Class Period, Plaintiff and the Class purchased common stock of Threshold at artificially inflated prices and were damaged thereby.   The price of Threshold's

common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

### SCIENTER ALLEGATIONS

45.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Threshold, their control over, and/or receipt and/or modification of Threshold's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Threshold, participated in the fraudulent scheme alleged herein.

46.    Additionally, during the Class Period the Company was able to successfully complete two stock public offerings.  On February 4, 2005, the Company completed its IPO by selling over 5.3 million shares of stock to the public at a price of $7.00 per share, for gross proceeds of over $37.3 million.  Then on October 12, 2005, the Company offered another 6.25 million shares of common stock to the public at a price of $10.46 per share, for gross proceeds of over $65.3 million.

47.    Also, during the Class Period, and with shares of the Company's stock trading at artificially inflated levels, members of the Company's Board of Directors, and various entities controlled by members of the Company's Board of Directors, sold over 6.1 million shares of the

Company's stock for gross proceeds of over $81.3 million.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

48.    At all relevant times, the market for Threshold's common stock was an efficient market for the following reasons, among others:

(a)    Threshold's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Threshold filed periodic public reports with the SEC and the NASDAQ;

(c)    Threshold regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Threshold was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.    As a result of the foregoing, the market for Threshold's common stock promptly digested current information regarding Threshold from all publicly-available sources and reflected such information in Threshold's stock price. Under these circumstances, all purchasers of Threshold's common stock during the Class Period suffered similar injury through their

purchase of Threshold common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Threshold who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

52.     This claim is asserted by Plaintiff against all defendants by, and on behalf of,

persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement issued in connection with the Company's February 2004 IPO, or the Company's October 2005 Follow-On Offering.

53.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Threshold and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

54.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

55.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

56.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Threshold's common stock sold in the IPO was artificially

inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of Threshold's common stock pursuant to the Registration Statement.

57.     Threshold is the issuer of the stock sold <u>via</u> the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

58.     At the times they obtained their shares of Threshold, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

59.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

60.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

**SECOND CLAIM**
**Violation of Section 12(a)(2) of**
**The Securities Act Against All Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

63.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Threshold Offering Registration Statement.

64.     The Threshold IPO Registration Statement contained untrue statements of

material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

65.    Defendants owed to the purchasers of Threshold's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

66.    Plaintiff and other members of the Class purchased Threshold's common stock pursuant to and/or traceable to the defective Registration Statement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

67.    Plaintiff, individually and representatively, hereby offer to tender to defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that common stock together with interest thereon. Class members who have sold their Threshold common stock are entitled to rescissory damages.

68.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold Threshold's common stock purchased in the IPO have the

right to rescind and recover the consideration paid for their Threshold common stock, and hereby elect to rescind and tender their Threshold common stock to the defendants sued herein. Plaintiff and Class members who have sold their Threshold common stock are entitled to rescissory damages.

69.    This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

70.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

71.    This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

72.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Threshold within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Threshold to engage in the acts described herein.

73.    Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

74.    By virtue of the conduct alleged herein, the Individual Defendants are liable for

the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**FOURTH CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Threshold's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Threshold's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

78.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Threshold's financial well-being, business relationships, and prospects, as specified herein.

79.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Threshold's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Threshold and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Threshold common stock during the Class Period.

80.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

81.     The defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Threshold's financial well-being, business relationships, and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

82.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Threshold's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Threshold's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Threshold's common stock during the Class Period at artificially high prices and were damaged thereby.

83.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Threshold was experiencing, which were not disclosed by defendants, Plaintiff and other

members of the Class would not have purchased their Threshold common stock, or, if they had

acquired such common stock during the Class Period, they would not have done so at the

artificially inflated prices which they paid.

84.     By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

85.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's common stock during the Class Period.

**FIFTH CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

86.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

87.     The Individual Defendants acted as controlling persons of Threshold within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading.  The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

88.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

89.    As set forth above, Threshold and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 17, 2007                         Respectfully submitted,

                                             **BRODSKY & SMITH, LLC**


                                             By:_Evan J. Smith, Esquire (ES3254)_
                                             Evan J. Smith, Esquire (ES 3254)
                                             240 Mineola Boulevard
                                             Mineola, NY 11501
                                             (516) 741-4977
                                             (516) 741-0626 (facsimile)

                                             **SCHIFFRIN BARROWAY
                                             TOPAZ & KESSLER, LLP**
                                             Richard A. Maniskas
                                             D. Seamus Kaskela
                                             280 King of Prussia Rd.
                                             Radnor, PA 19087
                                             (610) 667-7706
                                             (610) 667-7056 (facsimile)

                                             **Attorneys for Plaintiff**